# THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | | |
|---|---|---|
| PETER D. KINDER,<br>MISSOURI LIEUTENANT GOVERNOR, | ) | |
| | ) | |
| DALE MORRIS, | ) | |
| | ) | |
| SAMANTHA HILL, | ) | |
| | ) | |
| JULIE KEATHLEY,<br>individually and as parent and guardian for<br>MASON KEATHLEY, her minor son. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Cause No: _____ |
| v. | ) | |
| | ) | |
| TIMOTHY F. GEITHNER,<br>SECRETARY OF TREASURY, | ) | |
| | ) | |
| KATHLEEN SEBELIUS,<br>SECRETARY OF HHS, | ) | |
| | ) | |
| ERIC H. HOLDER, JR.,<br>ATTORNEY GENERAL | ) | |
| | ) | |
| HILDA L. SOLIS,<br>SECRETARY OF LABOR, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

## SUMMARY OF THIS CASE

This case is brought by Missouri Lieutenant Governor Peter Kinder (in his individual capacity as a Missouri citizen, taxpayer, and voter and also in his statutory capacity as Lieutenant Governor charged with being the advocate for Missouri's elderly) and by a number of individual Missouri citizens whose federal and state constitutional rights have been violated by certain provisions of the recently-adopted federal healthcare legislation. This case addresses those specific provisions of the newly-enacted federal health-care law that, as applied to these Missouri citizens, violate the rights they are guaranteed under the United States and Missouri Constitutions.

Plaintiffs support the laudable goal of assuring that every Missourian—and American— enjoy access to quality health care. Plaintiffs bring this case, however, because it is necessary that the legislation seeking this objective is consistent with their rights under the United States and Missouri Constitutions. The essence of this case is that certain provisions of the new federal health-care law—the Patient Protection And Affordable Care Act and its sister statute, the Health Care and Education Reconciliation Act (referred to herein, collectively, as "PPACA")—not only deny these Missouri citizens the right to maintain their current health insurance (or otherwise procure appropriate health care for their situation), but they do so through unconstitutional means.

I.      **THE MISSOURI CITIZENS BRINGING THIS CASE.**

A.      **Missouri Lieutenant Governor Peter Kinder, a Missouri constitutional officer charged by statute to advocate for Missouri's elderly.**

1.      Peter D. Kinder is a Missouri citizen, taxpayer, and resident of Cape Girardeau County, Missouri.

2.      On November 2, 2004, Missouri voters elected Peter Kinder to be their Lieutenant Governor.   Missouri voters reelected Lieutenant Governor Kinder on November 4, 2008.

3.      Lieutenant Governor Kinder's salary and benefits, like those of all Missouri's Constitutional officers, are determined by the Missouri Legislature and paid for by Missouri taxpayers.

4.      Lieutenant Governor Kinder is provided health insurance by the State of Missouri through a health-care plan common to other Missouri state employees called the Missouri Consolidated Health Care Plan.  The health care services covered under this plan and the terms of the plan are determined by the State of Missouri in its sovereign capacity.

5.      Lieutenant Governor Kinder pays for his share of the plan through a payroll deduction from his salary as an elected state official.

6.      The Missouri Constitution provides "[The Lieutenant Governor] shall have the same qualifications as the governor and shall be ex officio president of the senate.   In committee of the whole he may debate all

questions, and shall cast the deciding vote on equal division in the senate and on joint vote of both houses."  MO. CONST., art. IV, § 10.

7.      In addition to his enumerated duties as they are set forth in the Missouri Constitution, Lieutenant Governor Kinder has been empowered to advocate for Missouri senior citizens and those in long-term care facilities as the head of the Office of Office of Advocacy and Assistance for Senior Citizens.  *See* MO. REV. STAT. § 660.620 (2009).

**B.      <u>Dale Morris – an elderly Missouri citizen who desires the option to keep her Medicare Advantage coverage.</u>**

8.      Dale Morris is a citizen of the State of Missouri and is a Missouri taxpayer.

9.      Dale Morris lives in St. Louis County, Missouri.

10.      Dale Morris is more than 65 years old and has paid into the Medicare system for at least 10 years.  Under Sections 1818 (Part A), 1836 (Part B), 1851 (Part C), and 1860D-1 (Part D) of Title XVIII of the Social Security Act, she is eligible to receive health insurance benefits under Medicare.

11.      Dale Morris suffers, or has suffered, from several serious medical conditions including two heart attacks, colon cancer, and congestive heart failure.  As a result of these medical conditions, she has received quadruple bypass heart surgery and requires consistent medical care.

12. Under Section 1851 of Title XVIII of the Social Security Act, Dale Morris is eligible to purchase supplemental Medicare coverage—called "Part C" or "Medicare Advantage."

13. Medicare Advantage provides Dale Morris coverage for medical care and medical expenses not otherwise covered by traditional Medicare (Parts A and B), including prescription-drug coverage, vision, hearing, and preventive care. Medicare Advantage also allows Dale Morris to receive medical care from physicians and other providers who do not accept just Medicare Part A and B.

C. **Samantha Hill, a young Missourian who desires the ability to purchase major medical coverage but does not want to be forced to purchase insurance coverage she does not need or desire.**

14. Samantha Hill is a 21 year-old Missouri citizen and taxpayer living in Holden, Johnson County, Missouri.

15. Samantha Hill has (and desires to retain) the ability to purchase and participate in health-care plans offering "major medical" insurance coverage, defined as coverage with a high deductible.

16. Under these "major medical" plans, Samantha Hill pays for preventive care and routine medical expenses, but, should she become seriously ill, private insurance coverage will pay any "major-medical" or "catastrophic" medical expenses in excess of the deductible.

17.     An individual "major medical" plan (as such is currently available) is less expensive because it does not cover treatments that Samantha Hill does not need.  Rather than pay premiums for routine health care and treatments she does not want or need, Samantha Hill desires to personally pay for any routine medical expenses that would not be covered by a major medical health-insurance plan, with the money she saves by not having to purchase the more expensive federally-mandated health care coverage used to pay her other bills and living expenses.

18.     Samantha Hill lives a healthy lifestyle, does not smoke tobacco, and does not abuse drugs or alcohol.  She maintains a healthy regime of exercise and physical fitness.  She is unmarried, is not pregnant, and does not have any children.

19.     Samantha Hill has no need or desire to purchase or pay for insurance coverage covering infant and child care and, *inter alia*, lactation consulting and over 200 other preventative services.

**D.    Julie Keathley, on her own behalf and as parent and guardian of her son, Mason Keathley, an eight year old child with autism.**

20.     Julie Keathley is a Missouri citizen and a resident of Stoddard County.

21.     Mason Keathley is the son of Julie Keathley and her late husband Michael.

22.     Mason Keathley is eight years old and suffers from autism.

23.     On March 18, 2010, Senate Bill 618 passed the Missouri Senate.   On
        March 30, 2010, the bill was referred to the House Special Standing
        Committee on Health Insurance.   The bill subsequently passed and will
        become law effective August 28, 2010.

24.     Senate Bill 618 requires private medical insurance companies selling
        health care insurance in Missouri to provide coverage for autism-related
        behavioral therapy.

25.     Mason Keathley will benefit from this autism coverage requirement.

II.     **THE DEFENDANTS.**

    A.      <u>**Attorney General Eric H. Holder, Jr.**</u>

        26.     Eric H. Holder, Jr. is the Attorney General of the United States.  As the Attorney General, he is the head of the Department of Justice and the chief law enforcement officer of the federal government.  Accordingly, he is charged with enforcing the civil and criminal laws of the United States, including PPACA.  Defendant Holder is sued in his official capacity.

    B.      <u>**Secretary of HHS Kathleen Sebelius**</u>

        27.     Kathleen Sebelius is Secretary of the United States Department of Health and Human Services (HHS) and is named in her official capacity.

        28.     HHS is an agency of the United States government and is responsible for the administration and enforcement of certain provisions of PPACA.

    C.      <u>**Secretary of Treasury Timothy F. Geithner**</u>

        29.     Timothy F. Geithner is Secretary of the United States Department of the Treasury and is named in his official capacity.

        30.     The Treasury Department is an agency of the United Statesgovernment and is responsible for administration and enforcement of certain provisions of PPACA, including those provisions related to the Internal Revenue Service.

D.    **Secretary of Labor Hilda L. Solis**

31.    Hilda L. Solis is Secretary of the United States Department of Labor (DOL) and is named in her official capacity.

32.    The Department of Labor is an agency of the United States government and is responsible for the administration and enforcement of certain provisions of PPACA.

III.    **THE "PATIENT PROTECTION AND AFFORDABLE CARE ACT OF 2009" AND HOW IT CAME TO BE LAW.**

33.    On Christmas Eve, the United States Senate passed H.R. 3590, the PPACA. Sixty Senators cast a vote in favor of H.R 3590, 39 Senators voted against H.R. 3590.

34.    H.R. 3590 was referred to the United States House of Representatives.

35.    On Easter Week, March 21, 2010, the United States House of Representatives passed H.R. 3590 by a vote of 219 in favor and 212 opposed. No Republican member of Congress voted in favor of H.R. 3590, and 34 Democrat Members of Congress joined them in voting against the bill.

36.    On March 23, 2010, President Obama signed H.R. 3590.

37.    On March 21, 2010, the United States House of Representatives adopted H.R. 4872, the HCERA, in a parliamentary process called budget reconciliation. HCERA contained revisions and additional corrections to

H.R. 3590. The House passed this HCERA Reconciliation Bill with a vote of 220 in favor and 211 opposed. No Republican member of Congress voted in favor of H.R. 3590 and 33 Democrat Members of Congress joined them in voting against the bill.

38. The United States Senate, on March 25, 2010 passed an amended Reconciliation Bill by a vote of 56 in favor and 43 against, with 3 Democrat Senators voting against the measure.

39. H.R. 4872, as amended, was referred back to the House of Representatives.

40. On March 25, 2010 the House of Representatives passed the Reconciliation Bill, as amended by a vote of 220 in favor and 207 against, with 32 Democrats voting against the measure.

41. On March 30, 2010, President Obama signed the Reconciliation Bill.

42. The Government Printing Office has not yet printed a single reconciled document that contains the integrated provisions of the separate measures that constitute the Health Care Bill. The final PPACA is composed of Titles One through Nine of the original Senate Bill and Title 10 of the Senate Amendments to Titles One through Nine, and these provisions are overlaid with the revisions in the Reconciliation Bill.

43.    In March 2010, Speaker of the United States House Of Representatives Nancy Pelosi, said "[w]e have to pass the bill so that you can find out what is in it."[1]

## IV.    JURISDICTION

44.    This action arises under the Constitution and laws of the United States. Jurisdiction is conferred on this Court under 28 U.S.C. § 1331.

45.    This action also involves the United States as a defendant.  Jurisdiction is thus proper under 28 U.S.C. § 1346(a).

46.    Venue is proper as this is the district in which plaintiffs reside.  28 U.S.C. § 1391(e).

---

[1] Press Release, House Speaker Nancy Pelosi, Remarks at the 2010 Legislative Conference for National Association of Counties (Mar. 9, 2010) (available at http://www.speaker.gov/newsroom/pressreleases?id=1576).

## COUNT ONE

**PPACA Is Unconstitutional Because
It Commandeers Missouri State Employees And
Compels Them To Enforce A Federal Health Care Scheme In
Contravention Of Missouri's Sovereignty.**
*(Federalism, State Sovereignty, and the Tenth Amendment)*

**A.**     **The Constitutional Principle.**

47.     Article I, Section 8 of the United States Constitution confers upon Congress discrete, enumerated, and limited powers.

48.     The Tenth Amendment to the United States Constitution states, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

49.     In FEDERALIST 45, James Madison wrote "[t]he powers delegated by the proposed Constitution to the federal government, are few and defined. Those which are to remain in the State governments are numerous and indefinite."

50.     In FEDERALIST 46, Madison further explained that "[t]he federal and State governments are in fact but different agents and trustees of the people, constituted with different powers and designed for different purposes." The powers of the State governments, Madison clarified, "extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State."

51.    In FEDERALIST 14, Madison confirmed that in distinguishing the separate powers of these two levels of government, "the general government is not to be charged with the whole power of making and administering laws.  Its jurisdiction is limited to certain enumerated objects, which concern all the members of the republic, but which are not to be attained by the separate provisions of any.  The subordinate governments, which can extend their care to all those other subjects which can be separately provided for, will retain their due authority and activity."

52.    And in FEDERALIST 39, Madison wrote, "the local or municipal authorities form distinct and independent portions of the supremacy, no more subject within their respective spheres to the general authority, than the general authority is subject to them, within its own sphere."

53.    The United States Supreme Court has repeatedly recognized and affirmed the fundamental principle that the federal government and the states are dual and independent sovereigns.   "As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government."  GREGORY V. ASHCROFT, 501 U.S. 452, 457 (1991); *see also* PRINTZ V. UNITED STATES, 521 U.S. 898 (1997); LANE COUNTY V. STATE OF OREGON, 74 U.S. 71, 76-78 (1868).

54.    Because state governments are sovereign, state government officials may not be compelled to act under federal authority. The Supreme Court has emphasized that "there are attributes of sovereignty attaching to every

state government which may not be impaired by Congress, not because Congress may lack an affirmative grant of legislative authority to reach the matter, but because the Constitution prohibits it from exercising the authority in that manner." *NAT'L LEAGUE OF CITIES V. USERY*, 426 U.S. 833, 845 (1976) (overruled on other grounds by *GARCIA V. SAN ANTONIO METRO. TRANSIT AUTH.*, 469 U.S. 528 (1985); *see also U.S. TERM LIMITS, INC. V. THORNTON* 514 U.S. 779, 838 (1995) (Kennedy, J., concurring); *UNITED STATES V. LOPEZ*, 514 U.S. 549, 576-577 (1995) (Kennedy, J., concurring); *NEW YORK V. UNITED STATES*, 505 U.S. 144, 161-166 (1992).

55. This separation of federal and state influence—i.e., federalism—is, in tandem with the separation of powers, a bulwark of the Constitution's protections of individual liberty. "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *GREGORY*, 501 U.S. at 458.

56. The separation of federal and state government is inviolate, even where State officials consent to its violation. *NEW YORK*, 505 U.S. at 181 ("[T]he Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.").

57.     Nor can the federal government exercise its powers under the Commerce Clause to run roughshod over the sovereignty of state governments and duly-elected state officials. "When a 'La[w] . . . for carrying into Execution' the Commerce Clause violates the principle of state sovereignty reflected in the various constitutional provisions . . . it is not a 'La[w] . . . *proper* for carrying into Execution the Commerce Clause,' and is thus, in the words of The Federalist, 'merely [an] ac[t] of usurpation' which 'deserve[s] to be treated as such.'" *PRINTZ*, 521 U.S. at 923-24 (emph. orig.) (citing THE FEDERALIST NO. 33 (Alexander Hamilton)).

58.     The Constitution forbids the balancing of federal against state interests in the application of this principle. To the extent the federal government encroaches on upon the sovereignty of state government—for whatever purpose—such act is offensive to Constitutional norms, and null and void. "It is the very *principle* of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect." *PRINTZ*, 521 U.S. at 932 (emphasis in original); *cf. BOWSHER V. SYNAR*, 478 U. S. 714, 736 (1986) (declining to subject principle of separation of powers to a balancing test); *INS V. CHADHA*, 462 U.S. 919, 944-946 (1983) (same).

59.     When a federal statute—or any provision thereto—violates these fundamental constitutional principles, it is appropriate for this Court to hold those provisions unconstitutional and strike down all of the statute, or those portions that give rise to the violation. "Much of the Constitution is

concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear 'formalistic' in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day." *NEW YORK*, 505 U.S. at 187.

60.     Instead of following this constitutional imperative, the PPACA compels duly-elected Missouri officials to act under the direction of the federal government to implement a federal health-care scheme against their will and in contravention of their sovereign powers.

61.     It is clear that the "Federal Government may not compel the States to enact or administer a federal regulatory program." *PRINTZ*, 521 U.S. at 933 (quoting *NEW YORK*, 505 U.S. at 188); *see also FERC V. MISSISSIPPI*, 456 U.S. 742, 775 (1982) (O'Connor, J., dissenting).

62.     It follows that because the federal and state governments are sovereign within their own realms, neither can impose a direct tax on the either because such a tax is inimical to the sovereign power. The sovereign may tax, but is not taxed. As Justice Frankfurter has recognized, it is a fundamental principle of Constitutional federalism that "[s]ince two

governments have authority within the same territory, neither through its power to tax can be allowed to cripple the operations of the other. Therefore, state and federal governments must avoid exactions that discriminate against each other or obviously interfere with one another's operations." *GRAVES V. NEW YORK*, 306 U.S. 466, 488 (1939) (Frankfurter, J., concurring),

**B.** **How PPACA Violates These Constitutional Principles.**

63.    Contravening Missouri's sovereignty, PPACA commandeers Missouri's duly-elected state officials and compels them to enforce a federal regulatory health-care scheme.

64.    PPACA requires state officials to take certain actions in furtherance of the federal scheme. Section 1341 of PPACA, for example, requires states, including the State of Missouri, to implement and maintain a "reinsurance" program for the individual and small group market private insurance plans that experience a higher level of claims. Likewise, Section 1513 requires states, including the State of Missouri, to provide what the federal government defines as a "qualified health benefit plan" or face a substantial financial penalty payable to the Department of the Treasury. These schemes cannot take effect without the mandated cooperation of Missouri state officials.

65.    Lieutenant Governor Kinder, as a duly-elected constitutional officer of the State of Missouri, and the Plaintiffs as citizens of Missouri and Missouri

taxpayers, enjoy the protections afforded them by the United States and Missouri Constitutions, including the right to be free from unwarranted federal intrusion and interference.   Federal coercion of state officials betrays these protections.

66.   Because PPACA violates the principles of dual sovereignty and federalism by co-opting state officials to adopt federal law, this Court must invalidate these provisions of PPACA and enjoin the federal government from any further attempt to infringe on the sovereign powers of elected Missouri officials.

## COUNT TWO

**PPACA Is Unconstitutional Because It Mandates The Compensation
Missouri Must Provide Its Constitutional Officers.**
*(Federalism, State Sovereignty, and the Tenth Amendment)*

### A.   The Constitutional Principle.

67.   This Count is premised upon constitutional principles set forth previously. Therefore, we do not repeat, but incorporate, those points noted in Count One.

68.   Another principle flowing from the constitutional principles set forth is that the federal government may not mandate the terms of compensation a state may pay its elected constitutional officers.

69.   The federal government may not interfere with the unique prerogatives of state sovereignty, *inter alia*, the benefits that a state may provide to its constitutional officers.  In *NEW YORK V. UNITED STATES*, 326 U.S. 572, 582

18

(1946), Justice Frankfurter noted, "Surely the power of Congress to lay taxes has impliedly no less a reach than the power of Congress to regulate commerce. There are, of course, State activities and State-owned property that partake of uniqueness from the point of view of intergovernmental relations. These inherently constitute a class by themselves. Only a State can own a Statehouse; only a State can get income by taxing. These could not be included for purposes of federal taxation in any abstract category of taxpayers without taxing the State as a State."

70.     Likewise, the State of Missouri's determination of the compensation and benefits it will pay to its constitutional officers, judges, and/or other elected officials is a quintessential state function.

71.     In *GREGORY V. ASHCROFT*, 501 U.S. 452 (1991), the Supreme Court held that the Age Discrimination in Employment Act of 1967 did not apply to Missouri state judges.  "Congressional interference with this decision of the people of Missouri, defining their constitutional officers, would upset the usual constitutional balance of federal and state powers." *Id.* at 460. "In light of the ADEA's clear exclusion of most important public officials, it is at least ambiguous whether Congress intended that appointed judges nonetheless be included.  In the face of such ambiguity, we will not attribute to Congress an intent to intrude on state governmental functions regardless of whether Congress acted pursuant to its Commerce Clause powers or § 5 of the Fourteenth Amendment." *Id*. at 470.

72. In *GREGORY*, the Supreme Court held the determination of qualifications of government officials "is an authority that lies at the heart of representative government," and thus is a power reserved to the states and the people under the Tenth Amendment. *Id*. at 463.

73. If Congress cannot mandate the qualifications and retirement age for state court judges, it cannot mandate the nature and extent of health insurance coverage Missouri must provide its Lieutenant Governor and other constitutional officers.

**B.**    **How The PPACA Violates These Constitutional Principles.**

74. The State of Missouri provides Lieutenant Governor Kinder (and its other elected constitutional officers) health care pursuant to the Missouri Consolidated Health Care Plan.  This health care plan was adopted as part of a compensation package approved by the Missouri Legislature and signed into law by the Governor of Missouri.  *See* MO. REV. STAT., sec. 103, et seq.

75. Under this plan, also offered to Missouri state employees, Missouri pays a portion of the premium and determines the selection of available coverage. Missouri provides its state employees—including Lieutenant Governor Kinder—a variety of health-insurance coverage options and allows the individual state employees and officers to select an appropriate coverage option.

76.    By defining a minimum set of benefits that a state must provide to all its citizens, PPACA mandates at least part of the compensation package—in the form of medical benefits—Missouri must provide its elected state officials.

77.    Section 1513 of PPACA requires the State, as an employer, to provide a qualified health benefit plan or face a penalty payable to the Department of the Treasury.

78.    Because of these requirements, PPACA increases the cost to Missouri taxpayers of providing health-care coverage to Missouri state employees and elected State officials and limits the options and choices of health-care coverage available to Lieutenant Governor Kinder and other Missouri state employees and its elected officials.

79.    Additionally, because health-care coverage is a fundamental component of the compensation benefits Missouri provides its state employees and elected state officials, PPACA and its requirement of certain mandated coverage unconstitutionally invades Missouri's right as a state and co-sovereign to determine the appropriate compensation provided to its employees and elected officials.

80.    PPACA requires the State of Missouri to provide compensation for elected state officials and state employees in a manner that overrides the will of the people of Missouri as expressed by its duly-elected Legislature.

81.   Because Section 1513 of PPACA interferes with the sovereign right of the
State of Missouri, and in turn Missouri citizens and voters by and through
their elected state officials, to determine the compensation Missouri
provides its elected state officials and state employees, Section 1513 of
PPACA is unconstitutional and must be invalidated.

### COUNT THREE

**PPACA Is Unconstitutional Because It Imposes An Unconstitutional
Direct Tax and Penalty Upon The State of Missouri
Because Missouri Requires Insurance Companies
To Cover Autism Treatments.**
*(Federalism, State Sovereignty, and the Tenth Amendment)*

**A.    The Constitutional Principle.**

82.   This Count is also premised upon constitutional principles described
above.  Therefore, we do not repeat, but incorporate, those points noted in
Counts One through Two.

83.   Originally, the Supreme Court held the doctrine of "inter-governmental
tax immunity" prohibited states from taxing the income of federal
employees, *DOBBINS V. THE COMMISSIONERS OF ERIE CTY.*, 41 U.S. (16
Pet.) 435, 449-50 (1842), and likewise prevented the federal government
from taking the income of state employees, *COLLECTOR V. DAY*, 78 U.S.
(11 Wall.) 113, 128 (1870).

84.   This doctrine of inter-governmental tax immunity was overturned in 1939
in *GRAVES*.  Justice Frankfurter, concurring separately, explained that the
Court no longer held to the principle that a tax imposed upon income was
a tax upon the source from which the income was derived.  Thus, a tax

upon income an individual received from a state was not a tax upon the state itself. *Id*. at 487-92.

85.     Though the Court agreed that states could tax the income of federal employees (and affirmed the ability of the federal government to tax the income individuals were paid by States) the Court expressly noted—and affirmed—that state and federal governments are prohibited from imposing a direct tax upon each other. *Id*. at 487.

86.     Thus, the federal government may not impose a direct tax upon the State of Missouri in contravention of Missouri's sovereignty.   "A tax is considered to be directly on the Federal Government only when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities. . . .   The rule with respect to state tax immunity is essentially the same . . . ." SOUTH CAROLINA V. BAKER, 485 U.S. 505, 523 (1988) (internal quotation omitted).

**B.**     **How PPACA Violates These Constitutional Principles.**

87.     The regulation of insurance, including medical and health insurance, is a matter traditionally and customarily regulated by the states.

88.     Article IV, § 36(b) of the Missouri Constitution created the "Department of Insurance, Financial Institutions and Professional Registration."

89.   Under Mo. Rev. Stat. § 374.010, "The department of insurance, financial institutions and professional registration shall be charged with the execution of all laws now in force, or which may be hereafter enacted, in relation to insurance and insurance companies doing business in this state, and such other duties as are provided for by law."

90.   The Missouri legislature has adopted extensive statutes regulating health insurance in Missouri.  *See* MO. REV. STAT., ch. 376.

91.   The Missouri Senate adopted Senate Bill 167, requiring insurance providers in Missouri to cover up to $36,000 a year for behavioral therapy for children younger than eighteen years of age with autism. S.B. 167, 2009 Leg. Sess. (Mo. 2009).

92.   One of the many Missouri families benefiting from Senate Bill 167 is Mason Keathley and his mother Julie Keathley.  Mason Keathley suffers from autism and will benefit from the behavioral therapy provided for in health insurance plans regulated under Missouri Law.  Julie Keathley is widowed and a single mother responsible for providing for Mason's health care.  This benefit, mandated under Missouri state law, will allow Mason to receive medical care provided by his private insurance coverage that Julie Keathley would not otherwise be able to provide.

93.   Section 1311(d)(3)(B)(ii) as amended by Section 10104(e)(1) of PPACA, however, forces States (including Missouri) to make payments to or on behalf of any individual that is eligible for the premium tax credit to

defray costs for benefits managed by that State that are additional to 36B(b)(3)(D) of the Internal Revenue Code of 1986.

94.     In other words, because Missouri requires private health insurance companies to offer more coverage than PPACA's mandated coverage (in this coverage for children suffering from autism) the federal government imposes a direct tax upon the state of Missouri.

95.     Because Missouri (in the course of exercising its traditional state authority of regulating insurance companies and the terms of health-care insurance coverage provided Missouri citizens) requires insurance companies in Missouri to provide coverage of autism and behavioral therapy related to autism, and such coverage is not required by PPACA, Missouri will be required to pay a penalty to the federal Treasury in an amount to be determined by federal actuarial accountants.

96.     This is a direct tax upon the State of Missouri and its citizens, including Julie Keathley, and as such is unconstitutional.  Julie Keathley and her son, Mason Keathley, have the constitutional right to enjoy the benefits of Missouri citizenship without those benefits being directly subject to a penurious tax levied by the federal government.

97.     The payment of a direct tax must be appropriated by the people of the State of Missouri, or their Legislature in its sovereign role as the State's law-making body, consistent with the Missouri Constitution.

98.     Because PPACA is predicated on the assessment of direct taxes on the

State of Missouri in contravention of both the United States and Missouri

Constitutions, this provision is unconstitutional and Section

1311(d)(3)(B)(ii) as amended by Section 10104(e)(1) must be invalidated.

## COUNT FOUR

**PPACA Is Unconstitutional Because It Forces Missouri To Violate The
Missouri State Constitution and Enact an Unconstitutional State Tax Increase.**
*(Federalism, State Sovereignty, and the Tenth Amendment)*

A.      **The Constitutional Principle.**

99.     This count is also premised upon the above-stated constitutional

principles.   Therefore, we do not repeat, but incorporate, those points

noted in Counts One through Three.

100.    Article IV, § 4 of the United States Constitution states, "The United States

shall guarantee to every State in this Union a Republican Form of

Government . . . ."

101.    The United States Congress, on March 6, 1820, approved an act entitled

"An Act to Authorize the People of Missouri Territory to Form a

Constitution and State Government, and for the Admission of Such State

into the Union on an Equal Footing with the Original States, and to

Prohibit Slavery in Certain Territories."   3 Stat. 545 (1820) ("The

Missouri Act of Admission").

102.    The Missouri Act of Admission provides at Section 7, "And be it further

enacted, That in case a constitution and state government shall be formed

for the people of the said territory of Missouri, the said convention, or representatives, as soon thereafter as may be, shall cause a true and attested copy of such constitution, or frame of state government as shall be formed or provided, to be transmitted to Congress."  3 Stat. at 548.

103.   The people of Missouri did adopt such a Constitution and transmitted Missouri's proposed state constitution to the Congress.   On March 2, 1821, Congress by a joint resolution of the House and Senate accepted Missouri into the union on the grounds "[t]hat Missouri shall be admitted into this Union on an equal footing with the original States, in all respects whatever, upon the fundamental condition, that the fourth clause of the twenty-sixth section of the third article of the constitution submitted on the part of said State to Congress, shall never be construed to authorize the passage of any law, and that no law shall be passed in conformity thereto, by which any citizen of either of the States of this Union shall be excluded from the enjoyment of any of the privileges and immunities to which such citizen is entitled under the constitution of the United States."  3 Stat. 645 (1821).

104.   Article I, Section 3 of the Missouri Constitution provides:   "That the people of this state have the inherent, sole and exclusive right to regulate the internal government and police thereof, and to alter and abolish their constitution and form of government whenever they may deem it necessary to their safety and happiness, provided such change be not

repugnant to the Constitution of the United States." (Original Const. of 1875, art. II, § 2.)

105.    Article I, Section 4 of the Missouri Constitution further provides: "That Missouri is a free and independent state, subject only to the Constitution of the United States; that all proposed amendments to the Constitution of the United States qualifying or affecting the individual liberties of the people or which in any wise may impair the right of local self-government belonging to the people of this state, should be submitted to conventions of the people." (Original Const. of 1875, art. II, § 3.)

106.    Article X, § 2 of the Missouri Constitution provides that the Missouri Legislature's taxing power "shall not be surrendered, suspended or contracted away, except as authorized by this constitution."

107.    Article X, § 18 of the Missouri Constitution establishes a tax and expenditure limit upon the Missouri Legislature known as the "Hancock Amendment." Under this Amendment, the Missouri Legislature may not enact a tax increasing the percentage of Missouri citizens' income over a certain percentage of the State's gross domestic product without first obtaining a vote of the people.

108.    Like many states, the State of Missouri has a provision directing the manner and priority for payment of tax revenue from the Missouri treasury. MO. CONST., art. III, § 36. The funding priorities set forth by Missourians in their Constitution is that "[a]ll appropriations of money by

successive general assemblies shall be made in the following order:  First: For payment of sinking fund and interest on outstanding obligations of the state.   Second: For the purpose of public education.   Third: For the payment of the cost of assessing and collecting the revenue.  Fourth: For the payment of the civil lists.  Fifth: For the support of eleemosynary and other state institutions.   Sixth: For public health and public welfare. Seventh: For all other state purposes.  Eighth: For the expense of the general assembly." (Original Const. of 1875, art. IV, § 43.)

109.   In addition, the State of Missouri—unlike the federal government—is required to maintain a balanced budget, i.e., it can only spend as much money as it collects in revenues.

110.   States must remain "independent and autonomous within their proper sphere of authority."   *PRINTZ*, 521 U.S. at 928.   When the federal government passes laws that require implementation and appropriation by state legislatures, it oversteps its constitutional bounds, particularly where such implementation would contravene state constitutional provisions.

111.   The Supreme Court has warned that "[b]y forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for 'solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes. And even when the States are not forced to absorb the costs of

29

implementing a federal program, they are still put in the position of taking the blame for its burdensomeness and for its defects." *Id.* at 930.

**B.**     <u>**How The PPACA Violates These Constitutional Principles.**</u>

112.   Under Missouri law enacted prior to Congressional passage of PPACA, only certain specified low-income individuals and families qualified for Medicaid ("Medicaid Qualified Persons").   The qualifying income level set by Missouri was 19% of the federal poverty line for parents, and did not cover childless adults.

113.   Missouri pays 49% of the cost for medical treatment of Medicaid Qualified Persons.

114.   Missouri currently appropriates 26% of its annual budget to Medicaid payments.   This is a total—in fiscal year 2008—of approximately $3 billion.

115.   In opposition to Missouri law as enacted by the duly-elected Missouri Legislature and signed by its Governor, PPACA mandates that Missouri enroll in its Medicaid program, *inter alia*, all childless adults whose income is less than 133% of the federal poverty line ($14,404 for an individual and $29,326.50 for a family of four in 2009).   The law also includes a mandatory 5% income disregard bringing the actual eligible income level to 138% of the federal poverty line ($14,945 for an individual and $30,429 for a family of four in 2009).

116.    Importantly, many of these individuals were not uninsured but already have private insurance coverage or have such coverage available.

117.    Forcing Missouri citizens who currently have private insurance to enroll in Medicaid has several injurious effects on enrollees, health-care providers, and Missouri taxpayers.  First, this provision greatly increases Missouri taxpayers' obligation to pay for these individuals' medical care, when they otherwise would have been covered by private insurance.  Second, because Medicaid reimburses health-care providers (such as local hospitals and physicians) only about 65% of the cost of this care, whereas private insurance pays the full cost of medical care, the net result of this provision is to force these health-care providers to underwrite the cost of healthcare provided under Medicaid.  And, third, because health-care providers are reimbursed at a far lower rate, new enrollees from private plans are generally unable to maintain the same health-care services as they enjoyed under their private plans.

118.    Based on PPACA's unfunded mandates, it is estimated that more than 465,000 individuals will be added to Missouri's Medicaid rolls.  Based on the current average-cost-per-enrollee, the additional coverage population will impose on the State of Missouri an estimated cost of at least $51 million annually between the fiscal years 2017-19, but balloon to an additional $1 billion annually beginning in fiscal year 2020 when a federal subsidy covering part of the cost elapses.  The federal government does

not fund the additional costs that PPACA imposes upon Missouri and its
taxpayers.

119.   The enormous unfunded mandate PPACA imposes on the State of
Missouri interferes with its ability to govern itself in accordance with the
Missouri Constitution.  The State of Missouri can only pay the massive
additional cost imposed on it by the federal government if the Missouri
Legislature imposes extraordinary tax increases on the people of the State
of Missouri.

120.   The voters have not authorized Missouri to increase taxes to meet the
demand of this federal mandate and Missouri may not, under the Hancock
Amendment to the Missouri Constitution, raise state taxes without, at
least, the vote of Missouri citizens to approve such an increase.

121.   The Plaintiffs, as citizens of Missouri and Missouri taxpayers, enjoy the
protections afforded them by the Missouri Constitution.

122.   PPACA's effect is to employ the Missouri Legislature and the people of
the State of Missouri—in their sovereign capacity as citizens of an
individual State and sovereign legislators—to raise state taxes to fund an
illegal and unconstitutional federal health-care scheme.

123.   Because PPACA is predicated on the State of Missouri assessing taxes
unauthorized by voters as required by the Missouri Constitution, Section
2001 of PPACA, as modified by Section 10201 and H.R. 4872, Sections

1004 and 1201, imposing these additional expenses upon the Plaintiffs,

health-care providers, and the people of Missouri, must be invalidated.

## COUNT FIVE

**The PPACA Exceeds the Powers Granted Congress Under The Commerce Clause.**
*(Commerce Clause)*

**A.**    **The Constitutional Principle.**

124.    We incorporate those points noted in Counts One through Four.

125.    The powers enumerated and granted to the federal government in Article I,
§ 8 do not include any express power or authority of the federal
government to regulate private health insurance.

126.    The Commerce Clause states Congress shall have the authority to,
"regulate Commerce with foreign Nations, and among the several States
and with Indian tribes."  U.S. CONST., art. I, § 8, cl. 3.

127.    The federal government has exercised all manner of economic regulation
pursuant to the Commerce Clause, but its authority is not without limit.

128.    "The authority of the federal government may not be pushed to such an
extreme as to destroy the distinction, which the commerce clause itself
establishes, between commerce 'among the several States' and the internal
concerns of a State.  That distinction between what is national and what is
local in the activities of commerce is vital to the maintenance of our
federal system."  *N.L.R.B. V. JONES & LAUGHLIN STEEL CORP.*, 301 U.S. 1,
30 (1937).

129.  The broadest reach of the federal government's power to act under the Commerce Clause is found in *WICKARD V. FILBURN*, 317 U.S. 111 (1942), holding that the federal government could prohibit a farmer from growing wheat for household consumption because it would affect other wheat the farmer grew for sale in interstate commerce.

130.  Even given its broadest reading, *WICKARD* must still be read in light of the language of the Constitution and subsequent Supreme Court holdings. *See, e.g.*, *UNITED STATES V. MORRISON*, 529 U.S. 598 (2000) (holding Congress lacked authority to adopt civil damages provision in the Violence Against Women Act); *UNITED STATES V. LOPEZ*, 514 U.S. 549 (1995) (holding unconstitutional a federal gun law because the activity was not substantially related to interstate commerce).

131.  One common feature of all cases of the federal government's exercise of the Commerce Clause power is that the law adopted pursuant to it may "regulate" only interstate commerce.

132.  There has never been a case in which, under the Commerce Clause, the federal government was held to have the power to mandate that a private citizen enter into commerce.  The federal government does not have power to force a private citizen to enter into a commercial transaction, or otherwise purchase a good or service.

133.  A holding to the contrary would prove a massive expansion of federal government power far beyond those enumerated in the Constitution.  Such

a mandate is no different than a federal law ordering citizens to purchase, for example, a specific General Motors automobile.

**B.     How The PPACA Violates These Constitutional Principles.**

134.    Samantha Hill is a Missouri citizen who does not currently have health-care coverage.

135.    To the extent she is required to acquire health-care coverage, Samantha Hill desires to obtain only high-deductible "major medical" or "catastrophic" health insurance coverage.

136.    Samantha Hill seeks this high-deductible health insurance coverage because these plans are inexpensive, and more expensive health-care plans provide coverage she will not use and does not need.

137.    Section 1302(e) of the PPACA allows citizens to maintain catastrophic plans only if an individual is under 30 years of age and certifies that his or her premium payment is more than eight percent of his or her household income.   All other individuals will be required to have at least the minimum essential coverage determined by the Secretary of Health and Human Services.

138.    PPACA requires Samantha Hill to purchase a health-insurance policy that includes, *inter alia*, coverage in the following categories: ambulatory patient services, maternity and newborn care, mental health and substance

use disorder services, prescription drugs, laboratory services, and pediatric services including oral and vision care.

139. Should Samantha Hill not purchase this mandated health-care coverage, the PPACA imposes a financial penalty upon her, and others similarly situated. (*See* Section 1501, as amended by Section 10106.)

140. The class of "activity" reached by this provision is inactivity, the choice of Samantha Hill and other like individuals *not* to purchase a health-insurance policy required by PPACA. This is a decision not to engage in economic activity—not a decision to engage in commerce that can be regulated under Congress's Commerce Clause power.

141. As the provisions referenced above provide, Samantha Hill is denied the option of purchasing high-deductible, major medical, health insurance policy and is instead compelled to purchase a more expensive health-care plan she does not need and does not want.

142. Long before PPACA's passage, Congress knew the individual mandate to buy certain federally-sanctioned health insurance was constitutionally repugnant. A Congressional Research Service report to Congress noted the lack of constitutional authority for the mandate requirement, finding that "[d]espite the breadth of powers that have been exercised under the Commerce Clause, it is unclear whether the clause would provide a solid constitutional foundation for legislation containing a requirement to have health insurance. Whether such a requirement would be constitutional

under the Commerce Clause is perhaps the most challenging question posed by such a proposal, as it is a novel issue whether Congress may use this clause to require an individual to purchase a good or service." Jennifer Staman & Cynthia Brougher, Cong. Res. Serv., No. R40725, REQUIRING INDIVIDUALS TO OBTAIN HEALTH INSURANCE: A CONSTITUTIONAL ANALYSIS 3 (July 24, 2009).

143.    Similarly, the Congressional Budget Office wrote that "[a] mandate requiring all individuals to purchase health insurance would be an unprecedented form of federal action.  The government has never required people to buy any good or service as a condition of lawful residence in the United States.  An individual mandate would have two features that, in combination, would make it unique.  First it would impose a duty on individuals as members of society.  Second, it would require people to purchase a specific service that would be heavily regulated by the federal government."  Cong. Budget Off., THE BUDGETARY TREATMENT OF AN INDIVIDUAL MANDATE TO BUY HEALTH INSURANCE 1 (Aug. 1994), available at http://www.cbo.gov/ftpdocs/48xx/doc4816/doc38.pdf.

144.    The federal mandate requiring Samantha Hill to purchase a specific health-care policy exceeds the United States Congress's authority under the U.S. Constitution, as it is beyond even the broadest reach of the "commerce clause" power.  Thus, Section 1501 of the PPACA is unconstitutional as to Samantha Hill and must be invalidated.

## COUNT SIX

### The PPACA Imposes an Unconstitutional Direct Tax.
*(U.S. Constitution, Article I, §§ 2 and 9)*

**A.**     **The Constitutional Principle.**

145.     We incorporate those points noted in Counts One through Five.

146.     The United States Constitution provides, "Representatives and direct taxes shall be apportioned among the several states which may be included within this union, according to their respective numbers . . . ."  U.S. CONST., art. I, § 2, cl. 3.

147.     The United States Constitution also provides, "The Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States . . . ."  U.S. CONST., art. I, § 8.

148.     The United States Constitution further provides, "No capitation, or other direct, tax shall be laid, unless in proportion to the census or enumeration herein before directed to be taken."  U.S. CONST., art. I, § 9.

149.     In *EISNER V. MACOMBER*, 252 U.S. 189, 206 (1920) confirmed that the constitutional bar against a direct tax remained intact, holding that "[The Sixteenth Amendment] shall not be extended by loose construction, so as to repeal or modify, except as applied to income, those provisions of the Constitution that require an apportionment according to population for direct taxes . . . . This limitation still has an appropriate and important

38

function, and is not to be overridden by Congress or disregarded by the courts."

**B.**     <u>**How The PPACA Violates These Constitutional Principles.**</u>

150.   Should Samantha Hill not purchase a federally-mandated health insurance policy, PPACA imposes a financial penalty upon her. *See* PPACA, sec. 1501.   In an attempt to skirt the limits of its power, Congress grammatically styled these taxes as "shared responsibility penalties."

151.   By their very nature, the function and purpose of these "shared responsibility penalties" is not to raise revenue for the government, but instead to force individuals to purchase health insurance from private companies and fund the federal government's health care regulatory scheme through coerced payments to private companies offering a product regulated, defined, controlled, and mandated by the federal government.

152.   The "shared responsibility payment" or "penalty" is nothing but a tax imposed upon an individual.  The taxable event is the person's failure to maintain "minimum essential coverage" for any one-month period.  As such, this tax is levied on the person—not on the person's income.  Thus, it is a capitation tax violating Article I, Section 9 of the Constitution.

153.   The "shared responsibility payment" or "penalty" is not apportioned among the states as required by Article I, Section 9.  The Sixteenth Amendment, which authorized Congress to lay an income tax, did not

otherwise override the apportionment requirement of Article I, Sections 2 and 9.  *See EISNER*, 252 U.S. at 206.

154.   The federal government does not have the power to impose a direct tax upon a person nor to impose a direct tax that is not apportioned among the states.   Section 1501 of the PPACA violates both these Constitutional provisions as to Samantha Hill and others, and thus, must be invalidated.

### COUNT SEVEN

**The Health Care Bill Violates The Constitutional Guarantee
of Equal Protection and the Privileges and Immunities Clause.
*(Fifth Amendment, Fourteenth Amendment, Equal Protection Clause)***

**A.    The Constitutional Principle.**

155.   We incorporate the paragraphs of Counts One through Six.

156.   The Fourteenth Amendment to the United States Constitution provides, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST., amend. XIV, § 1.

157.   The Fifth Amendment to the United States Constitution provides, "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. CONST., amend. V.

158.   While the Fourteenth Amendment by its terms applies to the States, the Supreme Court since *BOLLING V. SHARPE*, 347 U.S. 497, 498-99 (1954) has

held the federal government to essentially the same standard under the Fifth Amendment.

159. The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. *PLYLER V. DOE*, 457 U.S. 202, 212-13 (1982).

160. The Supreme Court's Equal Protection and Fifth Amendment Due Process analysis have developed three levels of scrutiny—strict, intermediate, and rational basis—to which a legislative enactment is subject. *See, e.g.*, *LOVING V. VIRGINIA*, 388 U.S. 1 (1967) (applying "strict scrutiny" to invalidate Virginia's anti-miscengenation statute); *CRAIG V. BOREN*, 429 U.S. 190 (1976) (applying "intermediate scrutiny" to invalidate a law that denied women of a certain age the right to purchase alcohol while allowing men of the same age the ability to buy alcohol); *CLEBURNE V. CLEBURNE LIVING CENTER, INC.*, 473 U.S. 432 (1985) (holding that mentally-disabled persons were subject to a "rational basis" test and, on this basis, invalidated zoning laws and land use restrictions that did not meet standards of rationality).

161. Under even the lowest level of scrutiny, the "rational basis" standard, "[t]o withstand equal protection review, legislation that distinguishes between the [designated group] and others must be rationally related to a legitimate

governmental purpose. . . . The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.*, 473 U.S. at 446; s*ee also ZOBEL V. WILLIAMS*, 457 U.S. 55, 61-63 (1982); *U.S. DEP'T OF AGRIC. V. MORENO*, 413 U.S. 528, 535 (1973).

162.   In addition, the Supreme Court has found that the right to travel freely among the states is a privilege of American citizenship. *See SAENZ V. ROE*, 526 U.S. 489, 498 (1999) ("The word 'travel' is not found in the text of the Constitution. Yet the 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence.") (quoting *UNITED STATES V. GUEST*, 383 U.S. 745 (1966).

**B.**   <u>**How The PPACA Violates These Constitutional Principles.**</u>

163.   Dale Morris is a 75-year-old woman living in St. Louis County, Missouri.

164.   Dale Morris desires to purchase Medicare Part "C" (Medicare Advantage) coverage which provides supplemental coverage for health care and allows her to receive health care she would not otherwise receive under Medicare.

165.   Dale Morris suffers from several serious medical conditions including two heart attacks, colon cancer, and congestive heart failure.  As a result of these medical conditions, she has received quadruple bypass heart surgery and requires consistent medical care.

166.   Because of her medical conditions, Medicare Advantage supplemental coverage is especially important to Dale Morris so she can receive the medical care she requires.

167.   Section 3201 of PPACA (as amended by H.R. 4872, Sec. 1102) reduces Medicare Part C, dubbed "Medicare Advantage," supplemental coverage for most Americans by eliminating the Medicare Advantage Stabilization Fund.  This process begins on January 1, 2011 by freezing payments at 2010 levels.   Medicare supplemental coverage reimbursements are then reduced to an unsustainable level beginning in 2012.

168.   This prohibition on Medicare Advantage supplemental coverage applies to all Missouri citizens, including Dale Morris.  It further applies to all United States citizens, except individuals living in certain qualifying Florida counties described in Section 3201(c)(3)(B) of PPACA.

169.   The provision allowing individuals in certain Florida counties to continue purchasing Medicare Advantage supplemental coverage, but denying similarly-situated individuals in all other states similar Medicare Advantage supplemental coverage is a feature of PPACA popularly referred to as "Gator-Aid."

170.   The distinction between Dale Morris as a 75-year-old woman living in St. Louis County, Missouri and any similarly-situated woman or man living in qualifying counties in Florida is not rationally related to any legitimate

governmental purpose.  Indeed, denying Dale Morris the opportunity to purchase Medicare supplemental coverage simply based on her zip code is contrary to PPACA's purported purpose of increasing citizens' ability to obtain health-care coverage, particularly where similarly-situated United States citizens are able to continue to maintain their current coverage.

171.    Because the PPACA fails to provide a rational basis for discriminating among similarly-situated Americans, the provision of the statute must be invalidated.

172.    The provision popularly known as "Gator-Aid" is also contrary to PPACA's purported purpose of increasing citizens' ability to maintain their current health-care coverage.  President Obama, for example, promised that after PPACA's enactment, "if you like your health care plan, you keep your health care plan.  Nobody is going to force you to leave your health care plan."[2]

173.    But Dale Morris, her fellow Missouri citizens, and others who wish to "keep" their current health care plan, as President Obama promised them, are now required by federal law to uproot from their homes and move to one of the privileged counties specified by PPACA where Medicare Advantage will be maintained.  Conversely, holders of Medicare Advantage living in those counties cannot leave those counties without

---

[2]  President Obama, Remarks by the President in Town Hall on Health Care, Central High School, Grand Junction, Colorado (Aug. 15, 2009).

losing their health-care plan.  The burden on free passage introduced by these passages of the PPACA is inimical not only to basic protections of equal protection, but further to the freedom of movement that all American citizens are entitled to under the Privileges and Immunities Clause.

174.    Because Section 3201 of the PPACA violates Dale Morris's right to equal protection under the laws, as well as the Privileges and Immunities clause of the Constitution, that provision of the statute must be invalidated.

### COUNT EIGHT

**The Health Care Bill Violates The Due Process Clause And Free Speech Rights.**
***(Fourteenth Amendment, Due Process Clause; First Amendment)***

A.    **The Constitutional Principles.**

175.    The Fourteenth Amendment to the United States Constitution provides, "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST., amend. XIV, § 1.

176.    "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter."  *PLANNED PARENTHOOD OF SOUTHEASTERN PA. V. CASEY*, 505 U.S. 833, 847 (1992).  "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.  At the heart of liberty

is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.  Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State."  *Id.* at 851.

177.   The realm of personal liberty protected by the United States Constitution as defined by the Supreme Court includes the right to make personal health-care decisions on behalf of one's self, and if applicable, one's family.   Indeed, these are two general rights guaranteed by the Constitution but abridged by PPACA: the right to make family decisions and the right to physical autonomy.  *Id.* at 884.  In both these cases, the federal government has usurped these rights and injected federal officials into the decisions of Missouri citizens concerning their health care.

178.   Flowing from these rights is the central principle that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."  CRUZAN V. DIRECTOR, MO. DEP'T OF HEALTH, 497 U.S. 261, 278 (1990).  This liberty interest is inviolable.

179.   Not only is this liberty interest inviolable, but the Supreme Court has held that the doctor-patient relationship must be held similarly free of interference by and from the federal government.  CASEY, 505 U.S. at 844.

180.   The Supreme Court has long held that inherent in the First Amendment is not only the right to free speech, but the right to resist speech compelled by the Government, unless such speech is reasonably compelled to enforce

statutes or regulations adopted under some other properly-exercised federal power. *WEST VIRGINIA STATE BD. OF EDUC. V. BARNETTE*, 319 U.S. 624, 630 (1943). Thus, Americans regularly file 1040 forms and are required to register with the Selective Service. Even valid regulations that unreasonably compel speech are subject to First Amendment scrutiny. *SIMON & SCHUSTER, INC. V. MEMBERS OF NEW YORK STATE CRIME VICTIMS' BD.*, 502 U.S. 105, 117 (1991) ("We have long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment.").

**B.**     **How The PPACA Violates These Constitutional Principles.**

181.     Notwithstanding the Supreme Court's holdings as to the individual nature of the doctor-patient relationship, the PPACA establishes certain "panels" that purport to determine levels of appropriate treatment for various health care situations. (*See* PPACA, sec. 4003.)

182.     These federal panels interfere with the doctor-patient relationship, in that they direct and require treatment—or non-treatment—in a mandated manner without regard for the patient or the patient's doctor.

183.     Doctors and patients are not allowed to make decisions free from intervention, but are instead compelled to discuss and resolve questions of medical care only within the bounds that the federal panels have established.

184.   Moreover, as part of PPACA's enforcement scheme, individuals are required to certify that they have acquired a qualifying health insurance policy mandated by the federal government.

185.   Thus, decisions that were once made solely in the confines of a doctor-patient relationship are now delegated to unelected government "panels," violating the autonomy of the doctor-patient relationship and the individual liberty interests of Dale Morris, the Plaintiffs, and other Missourians to make personal medical decisions.

186.   These provisions are particularly harmful to individuals such as Dale Morris, who are ill and seek to exercise their freedom to obtain  medical advice and care from their physician free from officious government interference.

187.   An individual's decision to seek medical care and the nature and scope of the medical care of that care are constitutionally protected liberty interests. Flowing from this liberty interest is the constitutionally-protected relationship between a patient and doctor to make appropriate medical decisions.

188.   Under PPACA, this liberty interest has been violated.  Now, even when a patient and their physician determine the best medical treatment for the patient, and even if the patient is willing to pay for the cost of the treatment herself, she is not allowed to receive the medical treatment her

physician deems appropriate unless it is also agreed to by the government panel established under PPACA.

189.   The unelected panel of federal officials determining what medical care Dale Morris and other Missourians may or may not receive (even when they are willing to pay for the care themselves) is not based upon legitimate the patient's health or safety concerns but upon economic considerations.  In other words, this provision of PPACA, through which an unelected panel of federal officials determines what medical care Dale Morris and other Missourians may receive, is a rationing panel.

190.   Because it violates constitutionally-protected liberty interests belonging to Dale Morris and the other Missouri plaintiffs, without due process of law, Section 4003 of PPACA must be invalidated to the extent unelected federal panels are allowed to interfere with the constitutionally-protected relationship between individual and doctor and ration medically-appropriate care.

WHEREFORE, Plaintiffs request that:

1.     The Court declare the aforementioned sections of the PPACA unconstitutional as they apply to Plaintiffs;

2.     The Court enter an order enjoining the Defendants from enforcing the aforementioned sections of PPACA against Plaintiffs; and

3.	The Court award Plaintiffs costs incurred herein, and for such other relief as the Court shall deem just and proper.

Dated: July 7, 2010

**ARENT FOX, LLP**

_____

MARK F. (THOR) HEARNE, II
LINDSAY S. C. BRINTON
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 828-3447
Thor@ArentFox.com

ROBERT C. O'BRIEN
STEVEN A. HASKINS
555 West Fifth Street, 48th Floor
Los Angeles, CA, 90013
(213) 629-7400
obrien.robert@ArentFox.com

ATTORNEYS FOR PLAINTIFFS